# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

VONDELLE MONTEZ OVER,
        Plaintiff,

v.                                   Case No. 19-C-218

SAMANTHA MARKWARDT, et al.,
        Defendants.

## DECISION AND ORDER

Vondelle Montez Over, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I screened the plaintiff's complaint and allowed him to proceed on claims of deliberate indifference against medical and county defendants who work at the Milwaukee County Jail. The defendants move for summary judgment. ECF Nos. 60 & 71. As explained below, I will **GRANT** the defendants' motions and **DISMISS** this case.

## I. PRELIMINARY MATTER

The plaintiff submitted a letter the same day he submitted his response brief in which he states that various discovery items he received from the defendants are "blacked out." ECF No. 89. The blacked out items attached are redacted policies counsel for some defendants sent on August 4, 2020, in response to the plaintiff's request for "procedures to scope the action that medical and security staff (Milwaukee County Jail Security) was trained to take to prevent an inmate undergoing future injury." ECF No. 89-1; ECF No. 59 (counsel's response to the plaintiff's second motion to compel discovery). The plaintiff does not explain why he believes he is entitled to view these policies. Nor it is clear how these Jail policies are relevant to determining whether each defendant was personally responsible for providing him reasonable medical care but failed to do so, which are the issues on which the plaintiff is proceeding in this lawsuit. Whether any defendant failed to follow Jail policy in providing him treatment is not at issue in this lawsuit and is not the basis for a claim under § 1983. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

Moreover, the court previously addressed this issue in denying the plaintiff's motion for recruitment of counsel. ECF No. 87 at 4. The court noted in that order that it had denied the plaintiff's two previous motions to compel discovery because he "did not dispute the defendants' assertions that they provided him all requested materials and because [the plaintiff] did not comply with the Federal and Local Rules." *Id.* The court informed him that, if he had an issue with the discovery materials he received, "it was his responsibility to notify the court" before discovery closed. *Id.* Nonetheless, I also am unable to view these redacted policies, which the defendants have not included (redacted or not) with their summary judgment materials. Because the plaintiff has not had access to these polices, and because they appear irrelevant to the issues in this case, I will not consider the policies for purposes of this decisions.

The plaintiff also states that he cannot view the video of the January 3, 2019 incident on the thumb drive sent to him. The video in question shows the plaintiff's actions leading up to his fall on January 3, 2019, and the fall itself. The plaintiff has personal knowledge of the fall and includes in his response materials his detailed version of the fall. The video does not depict events about which the plaintiff is unfamiliar and does not affect his ability to respond to the defendants' motions. He also testified about the contents of the video and answered the defendants' questions about the video during his deposition. Because the plaintiff has first-hand knowledge of the events depicted in the video and has responded to the defendants' questions and assertions about the video, I will not exclude the video from consideration for purposes of this order.

## II. BACKGROUND[1]

### A. The Parties

The plaintiff was at all relevant times a pretrial detainee at the Milwaukee County Jail ("the Jail"). ECF No. 62, ¶¶ 1–2. I permitted him to proceed on Eighth Amendment claims

---

[1] Facts in this section are taken from the defendants' proposed findings of fact and declarations in support of their motions for summary judgment. ECF Nos. 62–69 & 73–74. The plaintiff did not respond to the defendants' facts or submit his own proposed findings of fact. He instead submitted several declarations in support of his responses in opposition to the defendants'

2

against Corrections Officer Hardeep Sodhi, Lieutenant Telia Evans, Captain Michael Hannah, and Corrections Lieutenant Rebecca Ehrmann (collectively "the County Defendants"); and Registered Nurse Samantha Markwardt. *Id.*, ¶¶ 3–8; ECF No. 74-1, ¶ 1. The County Defendants were employed by the Milwaukee County Sheriff's Office during all relevant times. ECF No. 62, ¶¶ 5–8.

B.     **Medical Treatment at the Jail**

At the time of the events alleged in the complaint, third-party Armor Correctional Heal Services, Inc. (Armor) provided medical services to inmates.[2] ECF No. 62, ¶ 27. Those services included screening inmates for medical conditions, providing ongoing medical treatment, prescribing and providing medications, imposing medical restrictions, and responding to medical emergencies. *Id.* Corrections officers do not know about inmates' medical conditions and do not have authority to initiate or provide medical or mental-health services to inmates. *Id.*, ¶ 28. Corrections officers instead contact medical staff about an inmate's medical needs or treatment, or the officer may instruct the inmate to complete a "pink and white" medical request form. *Id.*, ¶¶ 29–30.

The Classification Department at the Jail makes initial cell assignments when inmates arrive and changes the assignments as needed. ECF No. 62, ¶ 55. Corrections officers may submit requests on behalf of an inmate, but any cell change must go through the Classification Department. *Id.*, ¶ 66. Because they do not work in the Classification Department, Defendants Sodhi, Hannah, Evans, and Ehrmann do not make decisions regarding cell assignments or changes to housing assignments. *Id.*, ¶¶ 56–58. Even though

---

motions. ECF No. 77–78 & 83–84. Because the plaintiff did not properly respond to the defendants' facts, I will deem those facts admitted for purposes of this decision. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). I will consider the proposed facts only to the extent they are supported by evidence in the record, *see* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii), and will consider arguments in the supporting memoranda only to the extent they properly refer to the proposed facts, *see* Civil L. R. 56(b)(6).

[2] For simplicity, I will use the term "inmate" in this order to refer to both incarcerated inmates and pretrial detainees (like the plaintiff) housed at the Jail.

3

Hannah, Ehrmann, and Evans have supervisory positions in the Jail, they do not have the ability to make changes to cell assignments of any inmate. *Id.*, ¶¶ 57–58.

There are a limited number of lower-tier cells and beds, which are reserved for older inmates or those with medical conditions requiring a lower-tier and/or lower-bunk restriction. ECF No. 62, ¶¶ 59, 62. When the Classification Department receives a request for a restriction from an inmate or corrections officer, the Department consults with medical staff to confirm whether a restriction is appropriate. *Id.*, ¶ 68. Medical staff at Armor make the ultimate determination whether an inmate requires a medical restriction and consult with the Classification Department when making cell restrictions. *Id.*, ¶¶ 31, 60–61, 68. Any approved medical accommodations or restrictions are relayed to corrections staff via a form that medical staff drafts and provides to the Classification Department. *Id.*, ¶ 73. The Classification Department documents the restriction on the inmate's tier card and reassigns the inmate's housing assignment based on the medical order and available cells in the Jail. *Id.* Inmates with housing restrictions may be housed anywhere in the Jail that has space to meet the restriction. *Id.*, ¶ 62. Housing or cell restrictions have a set time limit, and medical staff do not automatically reevaluate the inmate once it expires. *Id.*, ¶ 64. Once the restriction ends, the inmate may be moved to another housing assignment or may request reevaluation by medical staff to retain the restriction. *Id.*, ¶¶ 64–65.

C.  **The Plaintiff's Conduct in the Jail**

The plaintiff has complained of a preexisting leg injury related to a car accident since his arrest leading to his confinement at the Jail. ECF No. 62, ¶¶ 9–10. Medical personnel and corrections staff believed the plaintiff engaged in self-harm or misused medical devices prescribed for his leg, including compression socks and ACE bandages. *Id.*, ¶¶ 16–17. On one occasion, Captain Hannah observed a gash on the plaintiff's leg that looked as if it had been caused by contraband and contained a piece of metal. *Id.*, ¶ 19; ECF No. 65, ¶ 11. On another, Lieutenant Evans recalled the plaintiff cutting his leg with his wristband or a pen. ECF No. 62, ¶ 22; ECF No. 64, ¶ 10. Evans was aware of other instances where the plaintiff was believed to have put fake blood on his leg. ECF No. 62, ¶ 20; ECF No. 64, ¶ 12. Medical

4

Case 2:19-cv-00218-LA   Filed 03/16/21   Page 4 of 20   Document 98

staff noted several instances in which the plaintiff stated he was bleeding, but his leg was in fact covered in red or cherry Kool-Aid. ECF No. 62, ¶ 21; ECF No. 69-2 at 33–34, 48, 54, 130. Medical staff and Jail staff also documented times the plaintiff wore multiple pairs of pants, which they believed could cause circulation issues in his right lower leg. ECF No. 62, ¶ 18. Officer Sodhi recalls an instance where the plaintiff had a pair of pants tied tightly around his leg in an apparent attempt to keep his leg swollen. *Id.*, ¶¶ 23, 26; ECF No. 63, ¶ 10. During his deposition, the plaintiff disputed wearing a second pair of pants. ECF No. 78, ¶ 9. He also disputed misusing his crutches. ECF No. 69-1 at 40:23–24.

Jail staff believed the plaintiff also hoarded contraband in his cell, including medical supplies, soda bottles, extra linens, and a piece of Jail sandals. ECF No. 62, ¶ 24. Staff believed the plaintiff might use these items to harm himself, other inmates, or Jail staff. *Id.*, ¶ 25.

While at the Jail, the plaintiff committed several disciplinary infractions and was in disciplinary housing on six occasions, including from December 21 to 27, 2018. *Id.*, ¶¶ 11–12. Once released from disciplinary housing, the plaintiff was assigned to cell 33 of pod 6B, a single-bed cell on the upper-tier of the Jail. *Id.*, ¶ 14. These single-bed cells accommodate lower-bunk restrictions because there is only one bed in the cell. *Id.*, ¶ 15.

### D. The Plaintiff's Medical Treatment

The plaintiff received medical treatment for his leg injury shortly after arriving at the Jail. ECF No. 62, ¶ 32. Medical staff did not provide him a medical restriction at that time, and he was cleared for general housing. *Id.*; ECF No. 69-2 at 4–5. About three weeks later, on June 30, 2018, medical staff examined the plaintiff and provided a medical restriction assigning him to the lower tier and to a lower bunk until July 15, 2018. ECF No. 62, ¶ 33; ECF No. 69-2 at 16. Medical staff later extended that restriction until September 3, 2018, and provided the plaintiff crutches and extra blankets to elevate his leg. ECF No. 62, ¶ 34; ECF No. 69-2 at 17–18. After a July 26, 2018 appointment, medical staff again extended the restriction "until medical cleared." ECF No. 62, ¶ 35; ECF No. 69-2 at 19. On October 4, 2018, however, the plaintiff's crutches were confiscated after he took them apart and used

them to hide contraband. ECF No. 62, ¶¶ 36–37; ECF No. 69-2 at 24. The crutches were returned to him two weeks later. ECF No. 62, ¶ 39; ECF No. 69-2 at 27.

On November 18, 2018, all medical supplies other than crutches and medical shoes were ordered removed from the plaintiff's cell because of concerns for his safety. ECF No. 62, ¶ 41. The plaintiff had been observed tying medical supplies too tightly around his right lower leg in a way that could cause injury and swelling. *Id.*; ECF No. 69-2 at 30–31, 117–18. On November 28, 2018, the plaintiff was inappropriately wearing a medical stocking around his arm, and security staff were notified to confiscate it. ECF No. 62, ¶ 42; ECF No. 69-2 at 32. The plaintiff testified that he never intentionally wore his medical devices inappropriately. ECF No. 69-1 at 53:6–18.

On December 7, 2018, the plaintiff complained to medical staff about not having medical devices he believed he needed. ECF No. 62, ¶ 43. Medical staff reviewed the plaintiff's leg, which he said had "just started bleeding." *Id.*; ECF No. 69-2 at 33. The plaintiff testified that "wounds popped up" while he was performing exercises medical staff had recommended. ECF No. 69-1 at 54:20–55:4. Staff noted the plaintiff showed no signs of pain during examination and had no open wounds on his leg, which was "tinted pink" and smelled like cherry Kool Aid. ECF No. 62, ¶ 43; ECF No. 69-2 at 33. Two days later, medical staff noted a similar pinkness and smell to the plaintiff's leg. ECF No. 62, ¶ 44. He complained about his treatment, threatened to sue medical staff, opined that his leg was "on the verge of being amputated," and then walked out of his appointment without any signs of difficulty or discomfort whatsoever. *Id.*; ECF No. 69-2 at 34. During a December 12, 2018 medical appointment, the plaintiff's medical restriction was changed from lower-tier/lower bunk to lower bunk only. ECF No. 62, ¶ 45. Medical staff also approved the plaintiff to have one extra blanket to elevate his leg while in his cell and one ACE wrap for his leg through March 31, 2019. *Id.*, ¶ 46; ECF No. 69-2 at 34.

Nurse Markwardt saw the plaintiff on December 28, 2018, for complaints of chest pains. ECF No. 74, ¶ 8. He did not bring up any issue with his leg or difficulty walking, nor did he state that he required a lower-tier restriction or request a return of that restriction. *Id.*;

ECF No. 74-1, ¶ 10. Medical notes from the examination state the plaintiff was "able to ambulate down the stairs." ECF No. 69-2 at 35. According to the notes, the plaintiff "was mainly complaining to the officers and writers about how he didn't get the new medications his outside provider ordered." *Id.* When Markwardt told him that medical providers at the Jail planned a different route of treatment, the plaintiff "began to yell about how he is in pain and he needs those meds." *Id.* The plaintiff testified that he also requested to be seen for pain in his leg, but the medical notes do not confirm his recollection. ECF No. 69-1 at 62:19–65:18. He also points to a medical note from October 16, 2018, that was "modified by" Markwardt. ECF No. 77, ¶ 7; ECF No. 69-2 at 102. There is no record showing Markwardt examined or spoke with the plaintiff that date.

### E. The Plaintiff's January 3, 2019 Fall

On January 3, 2019, the plaintiff was seen standing without the use of his crutch, dancing, and going up and down the stairwell numerous times. ECF No. 62, ¶ 89. The plaintiff testified that he avoided using the stairs because it was painful to go up and down, and he could only do so "slowly with assistance with a railing or crutch." ECF No. 69-1 at 48:20–49:3. Yet video from the two hours before his fall on January 3, 2019, shows the plaintiff going up and down the stairs thirteen times, sometimes without using the rails or his crutch at all. ECF No. 62, ¶ 89; ECF No. 69-1 at 76:23–77:12; ECF No. 72 at 7–10 (detailing the plaintiff's trips up and down the stairs and providing timestamps from the video). The plaintiff testified that he went up and down the stairwell to use the bathroom, get legal information or food, or other purposes. ECF No. 62, ¶¶ 91–92; ECF No. 69-1 at 76:6–78:24. Medical notes from the evening before the plaintiff's fall state that he "was walking independently but was playing with a crutch while walking around the pod." ECF No. 62, ¶ 48; ECF No. 69-2 at 36. The writer of the notes states she "found nothing to indicate he was ordered this assistive device." ECF No. 62, ¶ 48; ECF No. 69-2 at 36.

The County Defendants submitted a video taken from the two hours before and leading up to the plaintiff's fall. ECF No. 68-9 (video submitted as Ex. 1009). The video shows the plaintiff (the only inmate using a crutch) walking around the common area, using

7

the crutch, to speak with other inmates. He stands for extended periods of time without issue and often without using the crutch for support. He first descends the stairs at around 7:19 p.m. (19:19:00) and remains standing or walking around the area until 7:54 p.m. (19:54:00). He stands up from his chair (without issue and without using the crutch) at 8:06 p.m (20:06:30), walks around without using the crutch for support, and at 8:08 (20:08:00) ascends the stairs without using the crutch and while holding and eating off of a plate of food. He returns to his cell on the second floor also without using his crutch while still eating from the plate. While in his cell, he can be seen walking around without using the crutch. *Id.* at 20:10:22–37; 20:12:36–20:13:09. The plaintiff descends and ascends the stairs several more times over the next hour. He occasionally swings from the stairs, using his arm and the crutch to hover above the steps. *Id.* at 20:17:15–21. Although he takes the stairs slowly, as he testified, he does not appear to struggle or show difficulty or pain while doing so and does not always use his crutch while taking the stairs. *Id.* at 20:26:45–59, 21:06:01–07.

During the second shift, Officer Sodhi was assigned to the housing unit in which the plaintiff resided. ECF No. 62, ¶ 93. At approximately 9:19 p.m., Sodhi saw the plaintiff holding one crutch while walking down the stairs from the upper tier and then saw him "rolling down the stairs." *Id.*, ¶ 94. The video of the incident shows the plaintiff beginning to descend the stairs at 9:16 p.m. ECF No. 68-9 at 21:16:52. He stops after a few steps and appears to look around before continuing. *Id.* at 21:16:58. As he is planting his left foot, he falls down the remaining two-thirds of the stairs. *Id.* at 21:17:00.

Sodhi immediately notified master control for back-up to assist the plaintiff, locked-in the housing unit, and went to check on the plaintiff. ECF No. 62, ¶ 95. The video shows Sodhi briefly checking on the plaintiff before returning to the officer's desk to begin the lockdown, and the other inmates disperse to their cells. The plaintiff remains on the ground until another officer (presumably Lieutenant Ehrmann) arrives with other officers and medical staff comes over to check on him. *Id.*, ¶¶ 96–97; ECF No. 68-6 at 2; ECF No. 68-9 at 21:18:55. The plaintiff stated that he was uncomfortable and "mentioned something about his back" but said nothing about his face. ECF No. 62, ¶ 98. The Lieutenant Daily Briefing

from the date of the plaintiff's fall states the plaintiff "fell down the stairs" and was "conveyed to Froedtert Hospital for back pain." ECF No. 68-7 at 3. The plaintiff testified that he had cuts on his face, and his neck was stiff; but "[t]he main pain that I was feeling was in my back and in my leg." ECF No. 69-1 at 79:11–14.

Medical staff and other officers arrive about two minutes after the plaintiff falls. ECF No. 62, ¶ 99; ECF No. 68-9 at 21:19:12. Firefighters arrive about fifteen minutes later, ECF No. 68-9 at 21:33:41, and EMTs arrive with a stretcher about twenty minutes after that, *id.* at 21:51:48. Lieutenant Erhmann asked the fire department to remove the plaintiff's second pair of pants and his self-made shoelaces, which were not permitted. ECF No. 62, ¶ 99. The crew from the fire department removed the items and escorted the plaintiff to the hospital, accompanied by deputy sheriffs. *Id.*, ¶ 100; ECF No. 68-7 at 3.

The plaintiff was released from the hospital and returned to the Jail the next day. ECF No. 62, ¶ 49. He was given a lower-tier, lower-bunk restriction and a walker, and four days later was prescribed crutches, compression socks, and four blankets to elevate his leg. *Id.*, ¶¶ 49, 101; ECF No. 69-2 at 37–38. Officer Sodhi was again assigned to the plaintiff's housing unit. ECF No. 62, ¶ 102. Sodhi states that the plaintiff appeared fine and neither complained of pain nor demonstrated any difficulties walking on January 4 to 5, 2019. *Id.*, ¶¶ 103–04. Sodhi heard the plaintiff state that he was going to file a lawsuit because he did not believe he should have been housed on the upper tier. *Id.*, ¶ 104.

Over the next week, the plaintiff was seen several times for complaints of pain and issues with his pain medication. ECF No. 69-2 at 40–42. On January 15, 2019, the plaintiff was observed standing and braiding another inmate's hair while complaining about medical staff. ECF No. 62, ¶ 50; ECF No. 69-2 at 43. The plaintiff was standing without using crutches, showed no signs of difficulty standing or pain, and expressed frustration with his various treatments. ECF No. 62, ¶ 50; ECF No. 69-2 at 43. Medical staff prescribed him compression stockings, pain medication, and a muscle rub, but the plaintiff stated that the medication upset his stomach and that he was allergic to the muscle rub. ECF No. 69-2 at 44. During a nursing visit on February 10, 2019, the nurse examining him noted the plaintiff's

leg "appeared to be severely red," but the plaintiff informed her he had spilled Kool-Aid on his leg and in cuts on his leg. *Id.* at 54. The plaintiff told the nurse not to "'tell' staff what [she] observed because it would interfere with his case." *Id.*

By February 12, 2019, the plaintiff had resumed playing basketball. ECF No. 62, ¶ 51; ECF No. 69-2 at 54. Markwardt saw the plaintiff on March 10, 2019, for complaints that he could not lift his right leg. ECF No. 69-2 at 58. Markwardt wrote that the plaintiff "was walking fine with his crutch." *Id.* He was not wearing his prescribed compression wraps "because they get itchy." *Id.* Markwardt informed the plaintiff it was important to continue wearing his wraps and scheduled a follow-up appointment with a medical provider. *Id.* at 59.

By April 2019, medical staff discontinued the plaintiff's restrictions for crutches and a wheelchair after he was observed running, dribbling, shooting, and rebounding while playing basketball without distress. ECF No. 62, ¶ 53; ECF No. 69-2 at 58, 158, 168, 171. Medical staff returned his crutches later that month but did not return the wheelchair. ECF No. 62, ¶ 54; ECF No. 69-2 at 154. The plaintiff disputes he was playing basketball in April 2019 and testified that Jail staff conspired to have his wheelchair removed. ECF No. 69-1 at 84:10–85:17. On May 2, 2019, medical staff permitted the plaintiff crutches, one pair of medical stockings, two ACE wraps, and two blankets to elevate his leg but discontinued his medical shoes. ECF No. 62, ¶ 54; ECF No. 69-2 at 153. According to the plaintiff, he was transferred to Dodge Correctional Institution in June 2019. ECF No. 69-1 at 120:14–15.

F.      **Defendants' Statements**

Hannah states that he was familiar with the plaintiff's attempt to harm himself and seek attention but does not recall seeing him suffer from mobility issues. ECF No. 65, ¶¶ 5, 11–12. He states that if an inmate had asked him about a medical restriction, he would have instructed the inmate to fill out a medical request or would have personally spoken with medical staff at Armor. *Id.*, ¶ 18. The plaintiff testified that he spoke with Captain Hannah "a few times" about his leg injury, and Hannah told him to speak with his housing unit officer. ECF No. 62, ¶ 69; ECF No. 69-1 at 105:25–106:7. He testified that he believed Hannah was aware of his leg condition because of the multiple times Hannah had ordered the plaintiff

sent to segregation. ECF No. 62, ¶ 70; ECF No. 69-1 at 106:4–7. According to the defendants, however, the plaintiff was sent to segregation only twice before his fall, and neither time was at the direction of Hannah. ECF No. 62, ¶ 70 (citing ECF Nos. 68-4 & 68-5 at 8).

Lieutenant Evans remembers the plaintiff but states he had no direct interactions with him until after his January 3, 2019 fall and was not aware of any medical restrictions he had before then. ECF No. 64, ¶¶ 7–8, 13. Evans was not working on January 2 or 3, 2019, and did not see his fall or respond to it. *Id.*, ¶¶ 16–17. The plaintiff testified that his only encounter with Evans before the fall was "in passing" while he was being escorted to a different housing unit and told Evans that he was being taken to an upper-tier cell. ECF No. 62, ¶ 76; ECF No. 69-1 at 101:23–102:10. Evans states that, if an inmate told her he was erroneously assigned to an upper-tier cell or required a medical-based housing assignment, she would instruct the plaintiff to speak with his housing officer. ECF No. 64, ¶¶ 14–15. If the housing officer did not or could not direct the plaintiff to submit a medical request slip, Evans "would get involved and do the necessary follow up" to confirm the inmate's classification status. *Id.*, ¶ 15.

Officer Sodhi states that if he had seen an inmate struggle walking up or down the stairs, he would have contacted the medical and classification units to determine whether the inmate needed a change in cell assignment. ECF No. 63, ¶ 7. Had an inmate asked him for a lower-tier or lower-bunk assignment, he would have either contacted his supervisor, directed the inmate to complete a medical request form, or contacted the classification or medical units to determine whether a change in cell assignment was appropriate. *Id.*, ¶ 8. Sodhi remembers the plaintiff complaining to him about his leg, but he never observed the plaintiff in pain while walking. *Id.*, ¶ 9. The day of the plaintiff's fall, Sodhi observed the plaintiff "walking around the housing unit like any person without an injury, while carrying his crutch," walking or running up and down the stairs without difficulty, and swinging on the stairs. *Id.*, ¶ 12. At no point before the fall did Sodhi perceive the plaintiff to be at risk of injury or falling because of his assignment to an upper tier. *Id.*, ¶ 13. The plaintiff testified that he

first complained to Sodhi about his housing assignment in the early evening of January 3, 2019, and he believed Sodhi called someone to address his concerns. ECF No. 62, ¶ 78; ECF No. 69-1 at 96:13–99:5; ECF No. 78, ¶ 7 (plaintiff's declaration confirming that Sodhi called the health department about his complaints). The plaintiff testified that Sodhi "was a good dude . . . a very good guy" but that he "didn't enforce [the plaintiff's] rights the way he was supposed to." ECF No. 69-1 at 98:19–99:5.

Lieutenant Ehrmann states that she did not see the plaintiff struggle with mobility or express pain while walking. ECF No. 66, ¶¶ 7, 11. She states that if she had seen an inmate struggling, or if an inmate requested a lower-tier or lower-bunk assignment, she would have contacted the classification and/or medical units to address a potential change of cell assignment. *Id.*, ¶¶ 7, 10. Ehrmann was not aware of the plaintiff's medical complaints or issues until January 3, 2019, when she was the lieutenant for the sixth floor, which included the plaintiff's housing unit. *Id.*, ¶ 13. She states she never perceived the plaintiff to be at risk of injury or falling from being housed on the upper tier. *Id.*, ¶ 14. Like Officer Sodhi, Ehrmann saw the plaintiff before his January 3, 2019 fall running up and down the stairs without issue, carrying his crutch, and walking without a limp. *Id.*, ¶¶ 15–16. She states that he frequently complained about his leg and would become upset "if things did not go the way he wanted." *Id.*, ¶¶ 17–18. The plaintiff testified that he spoke with Ehrmann "multiple times," including in the days before his fall, during which Ehrmann "said she was going to be sure that" he was housed on the lower tier. ECF No. 69-1 at 46:17–47:7, 104:21–105:17.

Nurse Markwardt states that she had only limited interactions with the plaintiff in 2018 and 2019. ECF No. 74-1, ¶ 4. She states that he never told her he needed a lower-tier restriction, she was unaware he needed one, and she did not believe he needed one. *Id.*, ¶¶ 5–6. Markwardt also states that typically a doctor or other medical provider writes lower-tier medical restrictions. *Id.*, ¶ 7. Because she was not a "provider," she did not generally write or enter those restrictions. *Id.*, ¶¶ 7–8. The plaintiff agreed Markwardt was "not in position to prescribe anything for anybody," including a lower-tier restriction. ECF No. 69-1 at 73:15–24.

## III. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those that might affect the outcome of the suit. *Anderson*, 477 U.S. at 248. A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (quotations omitted). "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

Although the plaintiff as the non-moving party is entitled to all reasonable inferences in his favor, he may not rely on "inferences that are supported by only speculation or conjecture." *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (quotation omitted). As noted, the plaintiff failed to respond to the defendants' proposed facts, which I deem admitted. The plaintiff attempts to dispute the defendants' facts with statements in his declarations, which largely rely on speculation or conclusory assertions on matters about which the plaintiff lacks personal knowledge. Those statements, without supporting evidence elsewhere in the record, do not create a genuine dispute of fact that may defeat summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citing Fed. R. Civ. P. 56(e) (now Rule 56(c)(4)) and Fed. R. Evid. 602).

Because the plaintiff was a pretrial detainee at the time of the alleged events, I analyze his claim that he was denied adequate medical care under the Fourteenth Amendment. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Under the

13

Fourteenth Amendment, a detainee must show only that the medical care provided was objectively unreasonable and need not show that any defendant was subjectively aware that the medical treatment was unreasonable. *Id.* (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). The court must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). Although he need not establish that the defendants were subjectively aware of and disregarded his condition, the plaintiff still must show that the defendants acted "purposefully, knowingly, or perhaps even recklessly" in response to the plaintiff's risk of harm. *Miranda*, 900 F.3d at 353–54 (citing *Kingsley*, 576 U.S. at 396–97).

### A. County Defendants

The evidence shows that, contrary to the plaintiff's assertions, the County Defendants were aware of the plaintiff's apparent *lack* of an objectively serious medical need. After numerous medical visits and treatments since entering the Jail, the plaintiff's leg injury steadily improved. As his condition improved, medical staff adjusted his medical restrictions, removing those no longer necessary. By December 2018, the plaintiff retained only a bottom-bunk restriction and was allowed one extra blanket and an ACE wrap. It is undisputed that the County Defendants had no direct role in monitoring or adjusting those restrictions.

The days before and day of his fall, the County Defendants saw the plaintiff walking around the prison without using his crutch for assistance and without a limp or signs of distress or difficulty, taking the stairs without issue or use of his crutch, interacting with other inmates while standing and not using a crutch or anything else to assist him, and swinging on the stairs. No County Defendant observed the plaintiff showing any signs of difficulty standing, walking, or taking the stairs. The County Defendants also often observed (or were told about) the plaintiff exaggerating his symptoms, harming himself, or otherwise attempting to worsen his condition. All County Defendants swear that if the plaintiff had requested a changed cell assignment or showed difficulty ambulating, they would have either directed

him to submit a medical request form or would have personally contacted the Classification Department about his cell assignment.

The undisputed evidence, including the video taken inside the Jail, shows the plaintiff frequently ascended and descended the stairs without issue on January 3, 2019, the day of his fall. He sometimes did so without using his crutch or the railing for assistance or while carrying other items. Although the plaintiff testified that it was painful and difficult for him to go up and down the stairs, his account is directly contradicted by the video showing him easily taking the stairs numerous times. The plaintiff does not assert the video depiction is incorrect or does not show him or his fall from January 3, 2019. Therefore, I will not adopt his version of the facts relating to his fall. *See Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)). Regardless of his reasons for taking the stairs so frequently that day, that he had no issue using the stairs immediately before his fall shows his leg injury was not a serious medical condition necessitating a lower-tier medical restriction. His fall on January 3, 2019, was at worst an accident for which the County Defendants cannot be held liable. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The facts and circumstances available to the County Defendants did not show that the plaintiff had a medical issue requiring that he be housed on a lower level to avoid having to use the stairs.

The plaintiff testified that Captain Hannah and Lieutenant Ehrmann were aware before his fall of his desire for a lower-tier cell assignment. Those defendants' statements contradict the plaintiff's testimony. Nonetheless, this dispute of fact does not render summary judgment inappropriate for Hannah and Ehrmann. Even if the County Defendants were aware of the plaintiff's request for a medical restriction, the undisputed evidence shows that no County Defendant was able to impose that restriction or change the plaintiff's cell assignment to provide him a lower-tier cell. The County Defendants state that only Classification Department officers can suggest cell changes, and no defendant worked in that department. It is entirely possible Ehrmann or Hannah contacted the Classifications Department about the plaintiff's request, but that Department did not process the cell change

15

for him. There is no evidence any County Defendant failed to contact the Classification Department when he or she should have.

Even if the County Defendants contacted the Classification Department, medical staff with Armor had the final say in approving medical restrictions for inmates' cells. On December 12, 2018, only weeks before his fall, medical staff removed the plaintiff's lower-tier medical restriction based on his improved condition. The plaintiff's restrictions at the time of his fall included only a lower bunk, an extra blanket, and an ACE wrap. The County Defendants were entitled to rely on the professional judgment of the medical staff in imposing the restrictions the plaintiff had in December 2018. *See Miranda*, 900 F.3d at 343 (citing *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676, 678–79 (7th Cir. 2012)). Therefore, even if the County Defendants were aware of the plaintiff's request for a lower-tier cell, they did not act unreasonably by deferring to his medical restrictions disallowing one.

Nor is there evidence that the plaintiff filed medical forms or grievances about his situation and that the County Defendants were aware of those forms. He testified that he did not submit a medical request slip seeking a cell change. ECF No. 69-1 at 103:13–21. He instead asserts that the County Defendants "knew [his] injury" and were "well aware of [his] situation." *Id.* at 103:16–104:11. But it is undisputed no correctional staff knew about a particular inmate's medical conditions. Only medical staff had that information. What's more, each County Defendant states that based on his or her observations of the plaintiff, he did not appear to require a lower-tier cell. That the plaintiff generally submitted grievances against the County Defendants does not mean they were ever made aware of his complaints or condition. Nor do those grievances create a factual dispute because they are "neither sworn nor a declaration that 'set[s] out facts'" showing whether the plaintiff required a lower-tier restriction or that the County Defendants were aware of his desire for one. *See Jones v. Tilden*, 827 F.App'x 591, 2020 WL 6256870, at *2 (7th Cir. Oct. 23, 2020) (citing Fed. R. Civ. P. 56(c)(4); *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020); and *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578–79 (7th Cir. 2015)).

The plaintiff testified that the day of his fall, he told Sodhi he needed a lower-tier assignment. But he also testified that Sodhi responded by contacting the medical department about the restriction. The plaintiff testified that he told Captain Hannah "the issue," and Hannah told him to speak with his range officer about a cell change. *Id.* at 105:25–106:7. Sodhi and Hannah's responses to the plaintiff's request cannot be described as unreasonable; they did exactly what they as corrections officers were able to do for an inmate requesting a medical restriction. That the plaintiff did not immediately receive the lower-tier cell he wanted does not mean the County Defendants reacted unreasonably to his requests. *See Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (explaining that "prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

The plaintiff stated in his complaint that he was not given proper medical treatment after he returned to the Jail from the hospital on January 4, 2019. But the County Defendants were not responsible for providing medical care. As explained, Armor and medical staff were responsible for providing medical care. The plaintiff does not present any evidence that he requested that any County Defendants provide or send him for medical treatment, which treatment the County Defendants unreasonably denied or withheld.

The plaintiff asserts the defendants are lying about him harming himself because of a personal vendetta medical and security staff had with him. ECF No. 88 at 2–3. He states that he was "targeted" by the defendants for discipline after his fall. ECF No. 78, ¶ 15. But his claim in this lawsuit involves allegedly deficient medical treatment leading to his fall, not alleged acts of retaliation that occurred after it. *See* ECF No. 11 at 6–7; ECF No. 1 at 2–3. Moreover, the plaintiff cites nothing in support of his assertions. Unsupported arguments, like speculative statements, are not enough to avoid summary judgment. *See Ammerman v. Singleton*, 817 F.App'x 265, 268 (7th Cir. 2020) (citing *Herzog v. Graphic Packaging Intl, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)). The plaintiff, as the nonmoving party, needs to come forward with evidence showing his entitlement to relief. *Cooper v. Haw*, 803 F.App'x 942,

946 (7th Cir. 2020) (citing *Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012)). Although the plaintiff attached 123 pages of exhibits to his response brief, he cites few of these materials in his brief and does not explain their significance. His unsupported assertions and speculations do not create a genuine dispute of fact and cannot defeat summary judgment.

Based on the undisputed evidence, no reasonable jury could conclude that the County Defendants purposefully or knowingly and unreasonably responded to a risk of harm from housing the plaintiff on the upper tier. The County Defendants are entitled to summary judgment.

**B.    Nurse Markwardt**

There is no evidence showing that Nurse Markwardt provided unreasonable care to the plaintiff. Markwardt, the only medical defendant, remembers treating the plaintiff only once before his fall in late December 2018 but not to address his leg issues. Markwardt states that she did not know or believe that the plaintiff needed a lower-tier restriction, and he did not tell her he needed one or request she enter the restriction for him. The plaintiff insists he told Markwardt about his leg during their December 28, 2018 appointment. Even if the plaintiff had insisted to Markwardt that he needed a lower-tier cell, the plaintiff's credibility with medical staff had been damaged from the instances in which he appeared to have tied items around his leg to increase swelling, cut his own leg with contraband, and spilled red Kool-Aid on his leg to make his condition appear worse than it was. It would not have been unreasonable for Markwardt to believe, based on these previous medical encounters, that the plaintiff was embellishing his symptoms or condition and did not require a medical restriction for a lower-tier cell.

The plaintiff also insists Markwardt was aware of his condition before his fall because her name appeared in a medical note on his chart after an October 16, 2018 appointment. That note reflects only that Markwardt modified his treatment routine, not that she personally examined or spoke with the plaintiff. He does not assert that she saw or treated him that day, and there is no evidence that she did. Even if Markwardt was aware of the plaintiff's condition in October 2018, at that time he *had* a lower-tier restriction, and his condition was

gradually improving. It was not until December 12, 2018, after the plaintiff returned from a disciplinary stay, that his lower-tier restriction was removed. Whether Markwardt was aware of his condition in October 2018 is irrelevant to whether she was aware that he no longer had, but insisted he still required, a lower-tier restriction in December 2018.

Moreover, it is undisputed that as a registered nurse and not a doctor, Markwardt did not have the authority to write or enter lower-tier cell assignments for inmates. She instead deferred to the restrictions that medical providers prescribed. The plaintiff agreed in his testimony that Markwardt was unable to prescribe him a lower-tier restriction and that a medical provider, such as a doctor, would provide him the restriction. Markwardt would be unreasonable in deferring to the medical providers' restrictions only if she ignored an obvious risk the restrictions posed to the plaintiff's health. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (citing *Rice ex rel. Rice,* 675 F.3d at 683, and *Berry v. Peterman,* 604 F.3d 435, 443 (7th Cir. 2010)). As noted above, the facts and circumstances before Markwardt did not provide any reason for her to believe the plaintiff required a lower-tier restriction or that not having one posed an obvious risk to his health.

Markwardt also saw the plaintiff once after his fall. She noted he was walking fine with his prescribed crutch but was not wearing his prescribed compression wraps. She told him it was important to continue wearing the wraps and scheduled him for a follow-up with a doctor or other medical provider. The plaintiff does not present any evidence suggesting that Markwardt's treatment was unreasonable based on his conditions and misuse of his medical devices.

On the undisputed evidence, no reasonable jury could conclude that Markwardt provided unreasonable medical care to the plaintiff or unreasonably declined to provide him a lower-tier medical restriction. She is entitled to judgment as a matter of law.

19

Case 2:19-cv-00218-LA   Filed 03/16/21   Page 19 of 20   Document 98

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the defendants' motions for summary judgment (ECF Nos. 60 & 71) are **GRANTED**.[3] This case is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within 28 days of the entry of judgment. Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend either deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 16th day of March, 2021.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

---

[3] Because I am granting the defendants' motions on the merits, I do not address their arguments that they are entitled to qualified immunity.

20